UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ROSCHELLE McNEIL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:12CV1772 CDP |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Roschelle McNeil's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and her application for supplemental security income under Title XVI, 42 U.S.C. §§ 1381 *et seq.* McNeil claims she is disabled because she suffers from narcolepsy, cataplexy, and depression. After remand by this court and a second hearing, the Administrative Law Judge concluded that McNeil was not disabled. Because I find that the ALJ's decision was not based on some medical evidence as required, I will reverse and remand for a second time.

I. **Procedural History**

McNeil filed for disability income benefits and supplemental security income in May 2008, alleging an onset date of January 1, 2007. When her

1

application was denied, she requested a hearing before an administrative law judge. McNeil then appeared with counsel at an administrative hearing on September 23, 2009. McNeil and a vocational expert testified at the hearing.

After the hearing, the ALJ denied McNeil's application, and she appealed to the Appeals Council. In November 2010, the Council denied her request for review.

McNeil appealed to this court, which reversed and remanded on July 5, 2011. *McNeil v. Astrue, 4:10CV2305DDN [docket #18].* The court held that the ALJ had appropriately assigned little weight to an opinion from McNeil's treating doctor, but that after so doing, "the ALJ had no other medical opinion to rely on regarding plaintiff's narcolepsy, and scarce medical evidence in the record as a whole." (Tr., p. 345.) Without more medical evidence, the court could not determine what led to "apparent inconsistencies" in the findings about McNeil's residual functional capacity. (*Id.*) Ultimately, the court determined that the ALJ's decision could not have been based on substantial evidence without some medical evidence to support it. The court remanded so the ALJ could obtain and identify more medical evidence to support his conclusion and "discuss [McNeil's] increased medication dosages and determine whether they indicate any worsening" of her impairments. (Tr., p. 347.) The court found that the hypothetical questions posed to the vocational expert were proper at the time but should be reconsidered "to the extent that the ALJ's RFC finding may be modified upon remand." (*Id.*)

After remand, a new ALJ conducted a second hearing, at which McNeil and her attorney appeared. Again, McNeil and a vocational expert both testified. After the hearing, the ALJ ruled against McNeil, and again, the Appeals Council denied McNeil's request for review. The ALJ's decision thereby became the final decision of the Commissioner. *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

## II. <u>Evidence Before the Administrative Law Judge</u>

In the memorandum and order dated July 5, 2011, this court previously described the medical evidence, reports, and testimony from the first hearing before the ALJ. I will not repeat it here. Little evidence has been added to the record. Medical records from after 2011 indicate that McNeil continued to take Provigil to treat her narcolepsy and Zoloft to treat her cataplexy. (Tr., p. 446.) She continued to see Dr. Korgi Hegde at the Clayton Sleep Institute once per year.

### *Treatment Notes*

It appears that treatment notes from McNeil's 2010 and 2011 visits were not part of the record before the initial ALJ or court decisions. At a visit on January 11, 2010, Dr. Hegde noted that McNeil had been pregnant and then had a miscarriage, and that her symptoms had disappeared during her pregnancy. After the miscarriage, the symptoms returned. She was back on her medication and had "mild cataplexy." (Tr., p. 458.) A year later, at a visit on February 22, 2011, Dr. Hegde wrote that McNeil's "cataplexy is controlled but still has daytime

3

sleepiness." He planned to add Xyrem – after testing McNeil for obstructive sleep apnea – to help with both the cataplexy and the daytime sleepiness. (Tr., p. 457.) At a February 2012 visit, Dr. Hegde noted that McNeil was taking two doses of Provigil daily. He wrote that "she would benefit from 3 but not approved by insurance." (Tr., p. 464.)

McNeil also submitted a letter she wrote to her lawyer from sometime after her February 2012 appointment with Dr. Hegbe. In the letter, McNeil wrote:

> . . . Dr. Hegde would give me samples when either I was uninsured or couldn't afford to purchase my meds. You asked me to insure that the doctor write a statement as to such. Unfortunately, he refused to do so. He explained, that when he would give me samples he did not log the transactions as required for controlled substances. Hence, divulging such a statement could jeopardize his practice.

(Tr., p. 447.)

### *Sleep Disorders Questionnaire*

On February 7, 2012, Dr. Hegde completed a questionnaire about McNeil's residual functional capacity. He identified McNeil's symptoms as including cataplectic attacks, sleep paralysis, excessive daytime sleepiness, hypnagogic phenomena, and sleep attacks. Dr. Hegde wrote that McNeil had "sleepiness during [the] day on a daily basis." (Tr., p. 461.) Her daytime sleepiness was "still not fully controlled," and laughing would cause her knees to buckle. He checked boxes indicating that McNeil should avoid work involving climbing, heights, power machines, moving machinery, motor vehicles, and other hazards. He

checked a box indicating that she may need breaks at unpredictable intervals during the workday, and wrote in that she may also "need short naps once or twice a day." Dr. Hegde indicated that McNeil would have serious limitations in being punctual within customary tolerances and performing at a consistent pace. He checked a box indicating that McNeil had good days and bad days and predicted that she would need to be absent from work because of her impairments about twice a month. (Tr. 460-463).

### *Testimony at Hearing on February 13, 2012*

McNeil testified at a second hearing before an ALJ on February 13, 2012. Much of what she said was repetitive of her testimony at the earlier hearing. She described her work history as a self-employed cosmetologist, substitute teacher, and real estate broker. She stated that she still had a broker's license, which she maintained by taking online tests. Her last online class had been two years prior. (Tr., p. 297.)

McNeil testified about how her impairments had affected her work as a cosmetologist. Her husband would wake her up when clients would call or come by. She slept a few times per day for a four- or five-hour period. McNeil would sometimes "put people under the dryer and take a nap and then after they were dry, continue on." (Tr., p. 300.) She would set a timer so she would wake up in time. She could last a couple of hours before she had to sleep. McNeil stated that sometimes, "a good nap would do me good and I'd come back around."

Sometimes she would go "blank" while cutting a client's hair. Her mind "would be shut down," but she would "go automatically through the motions and do [a client's] hair which was just unsafe for the both of us." (Tr., p. 299.) She would ask her husband whether the client had paid because she did not remember. Although she was "stressed out" about using appliances, chemicals, and razors while essentially being asleep, McNeil had never physically hurt anyone. Sometimes she did not give a client the cut he or she had asked for because McNeil was asleep, and the client would complain. (Tr., p. 301.) If McNeil was napping in back, her husband would stall clients by saying "she'll be right with you" and things like that. (Tr., p. 302.)

>McNeil testified that she had problems getting to work on time. She stated:
>
>Sometimes I don't want to get out [of] the bed and I want to sit and it's just a bad feeling when you [are] used to working and being self sufficient. And I think I worked as long as I could safely and that's why I had to stop.

(*Id.*) She sometimes lost her train of thought and sometimes had hallucinations, which she described as "falling in and out of sleep." When falling asleep, she progressed straight to the stage of sleep where you dream, so she "might talk out, speak out or act a dream out." (Tr., p. 303.) This only happened if she was trying to fight sleep off. McNeil testified that she spent about half of the day sleeping or lying down. (Tr., p. 304.)

6

A vocational expert also testified. She stated that McNeil's previous jobs – hair stylist, small business owner, and substitute teacher – were all classified as light work. The ALJ asked the vocational expert whether McNeil could perform her past work if she had to avoid ropes, ladders, scaffolding, ramps, heights, hazardous machinery, and hazardous chemicals. The vocational expert testified that she could return to owning a small business or substitute teaching. The expert stated that McNeil could also perform other jobs, including order caller, mail clerk, and cashier.

McNeil's attorney asked the vocational expert to imagine a person of McNeil's age, education, and work experience who had daytime sleepiness every day that cause serious problems with punctuality and consistency of pace; who could not climb or be exposed to heights or hazardous machinery; who would have to avoid or limit driving and need breaks at unpredictable intervals; and who would need naps at least twice per day and miss work at least twice per month. The attorney asked the expert whether that person would be employable. The vocational expert testified that the person would "not be able to work competitively." (Tr., p. 308.)

### III. The ALJ's Decision

After remand, the ALJ found that McNeil had the severe, medically determinable impairments of narcolepsy and cataplexy, and that those impairments could reasonably be expected to cause the alleged symptoms. The ALJ found,

however, that McNeil's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the residual functional capacity assigned by the ALJ. At best, the ALJ wrote, McNeil's symptoms appeared "troublesome" but did not "impose limitations of such significance as to preclude sustained competitive employment." (Tr., p. 282.) In addition, the ALJ noted that assessments by two state consultative psychiatrists showed only mild mental impairment.

The ALJ wrote that none of McNeil's treating physicians had recommended that she not seek employment, that she had not required surgery or hospitalization, and that McNeil had only taken medications for two years though she had been diagnosed with narcolepsy twelve years prior. The ALJ noted that McNeil only saw Dr. Hegde once per year and that she had reported driving short distances despite Dr. Hegde's assessment that McNeil could not work in a job requiring her to operate a vehicle. McNeil's driving seemed "inconsistent with a fear of uncontrolled sleep attacks as alleged by" McNeil. (Tr., p. 283.)

The ALJ assigned "little weight" to the 2009 opinion submitted by Dr. Hegde in part because his statement that McNeil could not drive was "contradicted by the claimant's own behavior." The ALJ rejected the opinion because it was drafted at the request of McNeil's attorney in anticipation of litigation, because the opinions were "conclusory only" and spoke to issues reserved to the Commissioner. The ALJ pointed out that Dr. Hegde's treatment notes showed no

8

prior opinion that McNeil could not work. Furthermore, the ALJ noted that there was "no evidence that over the course of treatment the claimant experienced any significant worsening." (*Id.*)

The ALJ assessed McNeil as having the RFC to perform light work except that she should avoid climbing ropes, ladders, and scaffolds; working at unprotected heights; working around hazardous machinery; and exposure to hazardous chemicals. As such, the ALJ found that she was capable of performing her past relevant work as a small business owner and substitute teacher.

## IV. Discussion

The standards for determining disability under the Social Security Act were acknowledged by this court in the July 5, 2011 memorandum and order and will not be repeated here.

### *ALJ's Opinion Not Based on "Some Medical Evidence"*

Like she did before remand, McNeil argues that the ALJ decision is not based on "some medical evidence" as required. Residual functional capacity "is the most [a person] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545, 416.945. Although the ALJ must determine a claimant's RFC "based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000), the RFC is a medical question. Therefore, some medical evidence must support the determination of the claimant's RFC. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). An ALJ "should obtain medical evidence that addresses the claimant's

9

ability to function in the workplace." *Id.* (internal quotation omitted). However, although an ALJ must determine a claimant's RFC based upon all relevant evidence, the claimant bears the burden of establishing her RFC. *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).

In this case, the ALJ's RFC finding was not supported by some medical evidence. The ALJ rejected the 2009 opinion from McNeil's treating physician, Dr. Hegde, but other medical evidence of record is sparse. It consists mostly of treatment notes from annual visits to Dr. Hegde. Although an ALJ may consider the meagerness of the record in determining a claimant's RFC, infrequent doctor's appointments are not necessarily indicative that a claimant's impairments are not disabling. *See* 20 C.F.R. §§ 404.1502, 416.902 (ongoing treatment relationship exists even if claimant only sees treating physician "after long intervals" if that is typical for the claimant's conditions). The ALJ does not explain how she viewed the medical evidence as a whole, so this cannot constitute substantial evidence to support the ALJ's RFC determination. *See Tome v. Schweiker*, 724 F.2d 711, 713 (8th Cir. 1984) (ALJ may not disregard subjective complaints solely because there is no supporting objective evidence).

Although the ALJ acknowledged the February 2012 opinion submitted by Dr. Hegde (*see* Tr., p. 281), she did not discuss how she weighed that opinion. *See Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)) (no matter what weight ALJ gives to opinion from treating

physician, ALJ must "always give good reasons" for the weight assigned); *see also Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005) (remand required where ALJ failed to explicitly accept or reject non-treating psychologist's opinion or explain why her opinion should not be relied on). Upon remand, the ALJ should evaluate Dr. Hegde's 2012 opinion in accordance with Social Security regulations describing how the Commissioner weighs opinions from treating doctors.

The record contains opinions from medical consultants, but these consultants were tasked with assessing McNeil's psychological impairments, and they did not assess McNeil's physical impairments of narcolepsy and cataplexy. Their opinions, therefore, cannot constitute the substantial evidence necessary to support the ALJ's decision. *See Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000) (though subject to exceptions, the report of a one-time consultative examiner generally does not constitute substantial evidence, especially when contradicted by treating physician's opinion). Upon remand, the ALJ should consider whether a consultative evaluation of McNeil's narcolepsy and cataplexy is necessary. *See Haegele v. Astrue*, No. 410CV80 CDP, 2011 WL 830521, at *17 (E.D. Mo. March 3, 2011) (remand required where claimant had been repeatedly diagnosed with narcolepsy, treated with medication for several years, and school records referenced sleep study that was not part of record but ALJ found narcolepsy was nonsevere; ALJ had improperly substituted her own opinion for that of claimant's treating physicians); *see also* 20 C.F.R. § 404.1519a (Commissioner may order a

consultative examination "when the evidence as a whole is insufficient to allow us to make a determination").[1]

Furthermore, the ALJ stated that the record contained "no evidence that over the course of treatment the claimant experienced any significant worsening," but failed to acknowledge increasing dosages of Provigil prescribed by Dr. Hegde. *See McNeil v. Astrue*, No. 4:10CV2305 DDN, 2011 WL 2621705, at *11 ("The ALJ provided no explanation or discussion regarding plaintiff's increased dosages. Therefore, on remand, the ALJ must discuss plaintiff's increased medication dosages and determine whether they indicate any worsening in plaintiff's impairments."). Upon remand, the ALJ should consider – as previously instructed – whether the increased medication dosages indicate any worsening in plaintiff's impairments.

The ALJ also based her RFC finding in part on McNeil's "lack of compliance" with taking medications. But McNeil testified at the hearing that she took her medications every day. She stated that she had not taken her medication for a period approximately two years prior because she had not had insurance, had been rejected from Medicaid, and could not afford her prescriptions. (*See* Tr., pp. 303–04.) The Eighth Circuit has held that an inability to afford treatment can be

---

[1] The record contains a case analysis from Charles Lee, M.D., a regional medical consultant. (*See* Tr., p. 78.) On July 1, 2009, Dr. Lee reviewed the medical evidence, then concluded that "[s]ubsequent evidentiary material of response to medication regimen adjustment is not in evidence. Hence, an accurate RFC and extended duration cannot be determined. Thus, it is recommended that said evidence be obtained." The ALJ did not discuss Dr. Lee's report.

an independent basis for justifying noncompliance. *Tome*, 724 F.3d at 714. Upon remand, the ALJ should consider whether McNeil's earlier failure to take prescribed medication was justified by her financial situation.

The ALJ rejected Dr. Hegde's conclusion in 2009 that McNeil could not sustain competitive employment in part because it constituted an opinion on an issue reserved for the Commissioner. (*See* Tr., p. 283.) But the ALJ then based her RFC finding in part on the fact that "none of the claimant's treating physicians have ever recommended that she not seek employment." (*Id.*, p. 282.) The ALJ does not adequately explain these inconsistent findings, which should be revisited upon remand.

Finally, as this court previously noted, the ALJ appears not to have considered McNeil's testimony that she napped for four or five hours every day, even while she was working, or Dr. Hegde's opinion that McNeil's narcolepsy would require unpredictable breaks and naps every day. The vocational expert testified that a person with that type of limitation – in conjunction with other impairments – would not be able to sustain competitive employment. Upon remand, the ALJ should consider whether McNeil's need for daily naps would affect her residual functional capacity.

### *Hypothetical Questions*

McNeil also argues that the hypothetical questions posed to the vocational expert failed to capture the concrete consequences of her impairments and

therefore do not constitute substantial evidence upon which the ALJ's decision may rest.

The ALJ's hypothetical questions to a vocational expert must include those impairments that the ALJ finds are substantially supported by the record as a whole. *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011). The hypothetical should capture the concrete consequences of the claimant's impairments. *Id.* But the ALJ "may omit alleged impairments from a hypothetical question" posed to a vocational expert if there is "no medical evidence that those conditions impose any restrictions on [a claimant's] functional capabilities." *Owen v. Astrue*, 551 F.3d 792, 801–02 (8th Cir. 2008) (internal quotation marks omitted).

In this case, it is unclear whether the hypothetical questions posed to the vocational expert captured the concrete consequences of McNeil's narcolepsy. The hypothetical given by the ALJ did not include any limitation related to the need for scheduled or unscheduled breaks, daily naps, a flexible start time, or other mechanism for accommodating McNeil's daytime sleepiness. Dr. Hegde had opined that McNeil would need daily breaks and naps; would have serious limitations in being punctual and working at a consistent pace; and would miss at least two days per month due to her impairments. The ALJ did not explicitly accept or reject those statements or assign any particular weight to Dr. Hegde's 2012 opinion, so it is unclear whether the ALJ found that there were substantially supported by the record. Although the ALJ rejected Dr. Hegde's 2009 opinion, she

did not specifically consider the portion of his opinion in which he stated that McNeil's somnolence was not fully controlled by her medications. Therefore, I cannot find that there is "no medical evidence" to support McNeil's contention that her narcolepsy limited her ability to function beyond the limitations listed in the ALJ's hypothetical.

Furthermore, the omissions were not harmless. *See England v. Astrue*, 409 F.3d 1017, 1023–24 (8th Cir. 2007). When McNeil's counsel posed an additional hypothetical to the vocational expert that included all the limitations listed by Dr. Hegde, the expert opined that such a claimant would not be able to work competitively. As such, the ALJ should reconsider the testimony of the vocational expert upon remand and include such limitations as he or she finds are substantially supported by the record. To the extent that the ALJ's RFC finding may be modified upon remand consistent with this opinion, the hypotheticals should reflect those modifications.

## V. Conclusion

In sum, the ALJ's determination of McNeil's RFC is not supported by substantial evidence, including "some medical evidence" as required. Additionally, because of the inconsistencies in the ALJ's RFC finding, it is unclear whether the hypothetical posed by the ALJ captured the concrete consequences of McNeil's impairments.

15

I will therefore reverse and remand in order for the ALJ to formulate a new RFC based on the medical evidence in the record; to reconsider portions of Dr. Hegde's 2009 opinion; to assign weight to Dr. Hegde's 2012 opinion; to discuss McNeil's increasing medication dosages; to determine whether McNeil's temporary failure to take her prescribed medication was justified; to consider whether it is necessary to order a consultative examination to assess McNeil's narcolepsy and cataplexy; to assess McNeil's need for daily naps; and to evaluate whether the hypothetical posed to the vocational expert captured the concrete consequences of McNeil's impairments.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Date this 15th day of August, 2014.